FILED & ENTERED

APR 06 2021

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY fisherl     DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>Glen E Pyle<br><br><br><br><br><br><br>Debtor(s). | Case No.: 1:10-bk-24968-GM<br><br>CHAPTER 7<br><br>**MEMORANDUM OF OPINION ON MOTION BY MARC H. BERRY TO ENFORCE STIPULATION AND ORDER OF 10-4-2017 FOR DISBURSAL OF GROSS PROCEEDS AND FOR AN AWARD OF ATTORNEY'S FEES AND COSTS [DKT. 196]**<br><br>Date:        March 16, 2021<br>Time:        10:00 AM<br>Courtroom:  303 |

    Glen Pyle filed this bankruptcy case in 2010.[1]  In 2011, two adversary

proceedings were filed – one by Mark Berry for fraudulent transfer[2] and the other by Ian

Campbell to deny discharge and also dischargeability of a debt owed to Campbell.[3]

While the *Berry v. Pyle* Adversary Proceeding has been very long running and

contentious with a docket filled with briefs, memoranda, and orders, the related

---

[1] 10-bk-24968 (hereinafter "Bankruptcy Case")
[2] 11-ap-01180 (hereinafter "Berry Adversary Proceeding")
[3] 11-ap-01181 (hereinafter "Campbell Adversary Proceeding")

bankruptcy case lay dormant for years.  The Campbell Adversary Proceeding trailed the Berry one for years and eventually Campbell liquidated his debt in the state court, obtained a non-dischargeable judgment, and a denial of discharge.

In 2011, the Trustee sold her strong-arm powers to Mr. Berry so that he could proceed with the fraudulent transfer case that he had filed.  During the first six years of the litigation in *Berry v. Pyle,* the chapter 7 Trustee showed no interest in that Adversary Proceeding, although she may have received the reports due her under the sales agreement.  She became involved only after Mr. Berry, the purchaser of those powers, was no longer in sufficiently good health to continue to prosecute the Adversary Proceeding and he sold it back to the Trustee.  Meanwhile Mr. Berry and Mr. Campbell were the only active creditors, each pursuing his own adversary proceeding.

The key issue in this bankruptcy case is whether two pieces of real property are property of the estate or are owned by the Pyle Irrevocable Trust dated January 12, 2000 (the "Pyle Trust") and/or Sweetwater Management Company ("Sweetwater"). Rather than prosecute this issue, the Trustee entered into a contract selling 60% of the estate's interest in any recovery in the fraudulent transfer action to Mark Berry (later reduced to 50% when she bought it back).  Both the Trustee and Berry failed to find the single key legal theory that could have (and eventually did) bring a successful conclusion to the plaintiff without the need for any discovery at all.  Because of this error, the payment to creditors was delayed by close to a decade, Mr. Berry (an attorney that represented himself) spent massive amounts of time in useless discovery, the debtor/defendant incurred tremendous attorney fees, and the Court has been burdened with many hours dealing with hotly contested motions.

It appears that the time has finally come when all of the facts are laid out and a final decision can be made. A chronology is set forth below.[4]

---

[4] Mark Berry wished to add some events to the draft chronology.  While they are not particularly relevant to the issue at hand, they are included.  Bankruptcy Case, dkt. 211. On March 16, 2021, Mr. Aver, on behalf of Glen Pyle, filed a compilation on documents.  While these are largely irrelevant to this motion, a few items are included in the chronology and others are mentioned or discussed in this memorandum. Bankruptcy Case, dkt. 212

1

## The Events

2    Here is my understanding of what happened.

3    Mark Berry was the family law attorney for Glen Pyle.  Pyle failed to pay him

4    some $11,000 in attorney fees and Berry filed suit, receiving judgment in August 2000.[5]

5    This triggered a grudge match between Pyle and Berry, which later spilled over into the

6    bankruptcy proceedings.

7    Meanwhile, in January 2000, Pyle created an irrevocable trust with himself as the

8    grantor and the trustee.  The beneficiary was his son.  The alleged purpose of the Pyle

9    Trust was to provide for his son in case something happened to Pyle and to keep the

10    assets away from his former wife.

11    In 2000, Pyle owned two pieces of real property commonly known as 9466

12    Sunland Blvd., Sun Valley, CA ("Sunland") and 25226 Vermont Dr., Santa Clarita, CA

13    ("Vermont"), although it is possible that one or both were held in the name of his parents

14    at that point in time.[6]  There was also a third piece of property identified as Lot 12,

15    which was a vacant lot next to Sunland,  This was conveyed to the Pyle Trust in 2006,

16    but is not part of this Adversary Proceeding.  Sunland is the Debtor's residence and

17    Vermont is a piece of commercial property.

18    On February 24, 2000, six weeks after creating the Trust, Pyle apparently

19    created a grant deed transferring the Vermont property to the Pyle Trust and to

20    Sweetwater Management.  However he did not sign the grant deed until August 11,

21    2003 and did not record it until June 28, 2004.

22    In the meantime, Pyle gave Sweetwater Management a lien on Vermont through

23    a deed of trust that was dated August 1, 2000, signed and notarized on March 8, 2001,

24    and recorded on April 12, 2001.

25    As to Sunland, the grant deed from Pyle to the Trust was dated June 1, 2004,

26    signed on June 21, 2004, and recorded on June 28, 2004.

27    Berry renewed his judgment in June 2005 and in June 2010.

28
---
[5] Los Angeles Superior Court case 99C00380
[6] Berry Adversary Proceeding, dkt. 126, 2:12-15

Pyle had filed a short-lived chapter 13 case in 2005[7] and on November 30, 2010 he filed the current bankruptcy case under chapter 7.  Amy Goldman was appointed as Trustee.

In the 2005 case, Pyle stated in schedule A that he held a life interest in both Vermont and Sunland, but that his son was the beneficiary.[8]  However, in the current bankruptcy case, he stated on schedule A that he had no interest in any real property.[9] In fact, he filed an application to proceed *in forma pauperis,* showing no assets but a car, which was granted.[10] The meeting of creditors was set for January 6, 2011.

On March 7, 2011, Berry filed the Berry Adversary Proceeding under California Civil Code (CC) §§ 3302, 3439.09(a)(1), and 3439.10(c) to set aside transfers by Pyle. The initial complaint attaches a copy of the grant deed for Vermont to the Pyle Trust and a copy of a deed of trust (also for Vermont) from Pyle to Sweetwater, which had been recorded in 2001.  The transfer to Sunland was never mentioned.[11]  Three weeks later Berry filed a first amended complaint, which is the operative complaint in the Berry Adversary Proceeding.  Berry attached a copy of the Vermont grant deed and a document titled "legal description," which is that of Sunland.  This "legal description" is identified in paragraph 5(b) as being for a deed of trust to Sweetwater in 2001.[12]

After Berry filed the first amended complaint, Ms. Goldman notified him that the adversary action belongs to the estate and she offered to sell him the estate's interest in exchange for Berry's "legal efforts to prosecute the matter, including recovery, settlement, sale, determination of net proceeds, and disbursement."  Goldman provided

---

[7] Mr. Berry refers to the 2005 chapter 13 as Pyle's second bankruptcy case.  While it is not relevant, the Court cannot find any record of an earlier bankruptcy case on the court's docket.
[8] 05-bk-10761, dkt. 13-1
[9] Bankruptcy Case, dkt. 1
[10] Bankruptcy Case, dkt. 5
[11] Berry Adversary Proceeding, dkt. 1
[12] Berry Adversary Proceeding, dkt. 4.  Exhibit B to the First Amended Complaint is referred to as  a document recorded in 2001 whereas Exhibit B attached to that complaint was recorded in 2006.  A copy of the legal description for Sunland is attached to the title insurance policy in the Bankruptcy Case, dkt. 66

him with the language to go into the sale contract.[13]  The terms of the agreement, as presented to the Court, are as follows:

> The Trustee, through this Motion, seeks authority to sell all of the estate's potential avoidance action regarding the Debtor's alleged transfer of real estate assets.  The Trustee proposed to sell the avoidance action to Buyer, the Debtor's creditor, as he is intimately familiar with the facts and circumstances surrounding the alleged transfer as he had already commenced litigation against Debtor in state court prior to the Debtor filing the within bankruptcy case. . . . The Buyer would pay to the Trustee, for the benefit of the estate's creditors, a [*sic*] 40% of the net proceeds of any recovery minus reasonable attorney fees and costs ("Purchase Amount") as consideration for the purchase.[14]

The Order was slightly different from the Motion:

> [I]t it is hereby ORDERED that the Motion is granted, and it is further ORDERED that the Trustee is authorized to sell the Trustee's avoiding power rights to creditor Marc Berry ("Mr. Berry" or "Buyer"), to recover business assets sold by the Debtor to an employee pre-petition for less than reasonable equivalent value ("Pyle Transfer"), for 40% of the net proceeds of any recovery after payment of attorney fees and costs, ("Purchase Amount").  Further, Mr. Berry will provide quarterly updates on the status of litigation as set in accordance with the terms and conditions set forth in the Motion….[15]

Although she had a copy of the complaint(s) and thus of the grant deed on Vermont, it is apparent that Ms. Goldman did not order or review a title report or, if she did, she did not notice or follow up on the analysis of the title company that the deed given by Pyle to the Pyle Trust was void because it was made to the Trust rather than to

---

[13] Bankruptcy Case, dkt. 211, 9:12-21.
[14] Bankruptcy Case, dkt. 18. This contains an incorrect statement as the only state court action was the one for breach of contract.
[15] Bankruptcy Case, dkt. 24. This contains another error since this was not a sale to an employee.

the trustee of the Trust.  Had she done a proper analysis, she would have become aware that it would be a very simple matter to recover Vermont for the estate and that no fraudulent transfer proceeding was needed except as to Sweetwater Management, an entity with a questionable legal status which paid nothing for its interest in the property.[16]  Had she realized this, the whole matter could have been resolved within just a few months and with minimal administrative costs.[17]

Similarly, Berry was privy to the same information as was the Trustee.  He had a copy of the Vermont deed and attached it to the complaint.  He did not have an updated title report, which would have been wise, but not absolutely required.  But it does seem that discretion would have obliged him to make sure that a further transfer had not taken place.  However, like the Trustee, he did not know the legal ramifications of the transfer to a trust rather than to the trustee of a trust.

For the next 6 years the parties tussled through ongoing discovery battles. This was not one-sided.  Pyle did everything in his power to frustrate Berry and Berry pounded away at him with legal process. Pyle was so uncooperative that the Court refused to let his attorney substitute out since it was only through his attorney that the Court could be sure that he received notice of proceedings and at least somewhat complied.[18]  The docket is replete with motions, sanctions, and the frustration of Berry and of the Court.  There were further delays due to the health problems of both Berry and Pyle.

During all of this time, the Trustee was presumably kept aware of the litigation as required by the sale agreement and order.

---

[16] It is unclear whether Sweetwater was ever legally able to qualify to own property.  Pyle testified in his deposition that Sweetwater was a dba for the Pyle Trust.  Thus, if the attempted transfer to the Pyle Trust was a nullity, the fact that Sweetwater was a co-transferee is also a nullity. Pyle Deposition transcript, February 10, 2014, p. 248, ex. A to Bankruptcy Case dkt. 195. Also the identification of Sweetwater on the deed as to Vermont gives notice of a possible problem:  "(The Pyle Irrevocable Trust) Sweetwater Management Co." Berry Adversary Proceeding, dkt. 4

[17] The Court is concentrating on Vermont because that is the grant deed attached to the complaints and it is commercial property and thus without complex issues such as a possible homestead.

[18] For example, Pyle kept contending that he could not receive his mail because the Post Office would not deliver it to him since he did not have a mailbox or an acceptable mailbox.  Pyle lives in an urban area with local post offices. If there was a delivery issue, it was up to him to obtain a mailbox or a post office box or go to the branch and pick up his mail on a regular basis.

Finally, in 2017, due to his poor health Mr. Berry closed his office, gave up his law license, and tendered the Berry Adversary Proceeding back to the Trustee. They entered into a new agreement denominated as a modification of the sale order "in order to permit the Trustee and her counsel to finalize the prosecution of the Adversary Proceeding." This agreement provides as follows:

1. Berry hereby unconditionally and irrevocably assigns, grants, and transfers all rights, title, interest, and obligation in, to and under the Adversary Proceeding and the claims asserted therein to the Trustee, solely in her capacity as the bankruptcy trustee of the above captioned estate.

2. The Trustee has the sole authority and discretion, subject to Court approval, to prosecute or not, compromise, settle, dismiss or take any other action related to the Adversary Proceeding.

3. The Trustee and Berry agree to distribute the gross proceeds of any settlement, judgment or proceeds from the Adversary Proceeding as follows:

a. First, upon satisfactory proof to the Trustee, all of Berry's costs associated with this Adversary Proceeding up to $8,000.00;

b. After payment of the costs in paragraph "a." fifty percent (50%) to Berry and fifty percent (50%) to the bankruptcy estate.

4. Berry's claims in the Debtor's bankruptcy case shall be unaffected by this Stipulation.

5. Berry's sanctions awards against the Debtor and or the Debtor's counsel shall remain Berry's property to enforce as he deems appropriate.

6. The terms contained in this Stipulation related to the ownership of the Adversary Proceeding and distribution of

1    any proceeds of the litigation supersede  any such language in

2    the June 17, 2011 Order.[19]

3

4    At the time of this agreement no one realized that the fraudulent transfer action

5    was not needed as to the Pyle Trust (though it may have been relevant as to the

6    Sweetwater deed and trust deed).

7    The Trustee hired counsel.  Meanwhile the Campbell  Adversary Proceeding

8    drew to conclusion with a ruling denying discharge of the Debtor.[20]  Campbell, now

9    deceased and replaced by Mary Casamento as the administrator of his estate, had

10   received a judgment from the superior court, which became an unsecured claim in the

11   Pyle bankruptcy case.  In March 2019, Campbell's attorney ordered and received a title

12   report as to Sunland and Vermont.  In November 2019, Benjamin Nachimson

13   substituted in for Campbell and reviewed the file, finding the title report and realizing

14   that there seemed to be some problems with the prior transfers.  In December 2019, he

15   sent a copy to Leonard Pena, counsel for the chapter 7 Trustee, who indicated that he

16   had seen a title report that differed from the one sent by Nachimson.[21]

17   On May 11, 2020, the Trustee filed a motion for turnover of both properties based

18   on the information contained in the two title reports provided by Nachimson.[22]

19   Meanwhile, in the Berry Adversary Proceeding, Pyle had moved for summary

20   judgment, which was denied due to a disputed fact as to the application of the statute of

21   limitations.[23]  After the chapter 7 Trustee took over the Adversary Proceeding, there

22   were a variety of continuances and the matter moved toward preparation for trial.  Berry

23   remained active in seeking sanctions for various discovery breaches and Pyle's attorney

24   unsuccessfully attempted to withdraw.  Finally, on May 26, 2020, Ms. Goldman applied

25   to substitute in as plaintiff[24] and also filed a motion to strike the answer of Sweetwater

26   _____

27   [19] Bankruptcy Case, dkt. 50, 53
[20] Campbell Adversary Proceeding, dkt. 150, 151
[21] Bankruptcy Case, dkt. 194

28   [22] Bankruptcy Case, dkt. 66
[23] Berry Adversary Proceeding, dkt. 169
[24] Berry Adversary Proceeding, dkt. 272

Management and enter default because Sweetwater was a suspended corporation and therefore lacked the capacity to defend.  This was granted on July 1, 2020 and judgment was entered on September 30, 2020.[25] Nothing else has happened in the Berry Adversary Proceeding.

## CHRONOLOGY OF EVENTS

| Date | Event | Source | Comments | Notes |
|------|-------|--------|----------|-------|
| 8/28/1995 | Glen Pyle files family law matter against Lynn Pyle | LASC ED014870 | | |
| 8/18/1998 | Berry and Pyle enter into an attorney/client contract re: Pyle Family Matter, LASC ED014870 | 10-bk-24968 | dkt. 212, p. 50-58; Calls for binding arbitration of fee disputes | Pyle raised this in LASC 99C00380 |
| 8/26/1998 | Berry substitutes into the LASC family law case to represent Pyle | LASC ED014870 | | From the docket it appears that this is the correct date |
| Before 10/1998 | Glen Pyle opens a family law case in Nevada against Lynn Pyle | 10-bk-24968 | dkt. 212, p. 67 | Nevada Ninth Judicial District Court case 98-cv-00192 |
| 11/18/1998 | Berry files a motion to withdraw as counsel for Glen Pyle in LASC family law case | LASC ED014870 | | Appears to have been granted 12/23/1998 |
| 4/5/1999 | Berry fills a complaint against Pyle for breach of contract | LASC 99C00380 | | |
| 1/12/2000 | Irrevocable Trust created - Pyle is the grantor and the trustee. His son Christopher is the beneficiary. | 11-ap-01180 | dkt 116 | |
| 2/24/2000 | Grant deed on Vermont from Pyle to Trust and Sweetwater dated | 11-ap-01180 | | invalid because not to trustee of the Trust |
| 8/1/2000 | Trust Deed from Pyle to Sweetwater as to Vermont dated | 11-ap-01180 | | |
| 8/7/2000 | Berry obtains judgment in 99C00380 | Proof of Claim | for $11,369.45 | |
| 3/8/2001 | Trust Deed from Pyle to Sweetwater as to Vermont signed | 11-ap-01180 | | |
| 4/12/2001 | Trust Deed from Pyle to Sweetwater as to Vermont recorded | 11-ap-01180 | | Would merge with grant deed |
| 8/11/2003 | Grant deed on Vermont from Pyle to Trust and Sweetwater notarized | 11-ap-01180 | | |
| 6/1/04 | Grant deed on Sunland from Pyle to Trust and Sweetwater dated | 11-ap-01180 | | |
| 6/21/04 | Grant deed on Sunland from Pyle to Trust and Sweetwater signed | 11-ap-01180 | | |

---

[25] Berry Adversary Proceeding, dkt. 273, 287, 321

| Date | Event | Source | Comments | Notes |
|------|-------|--------|----------|-------|
| 6/28/2004 | Grant deed on Vermont from Pyle to Trust and Sweetwater recorded | 11-ap-01180 | | void transfer to Trust; void transfer to Sweetwater as invalid corporation |
| 6/28/2004 | Grant deed on Sunland from Pyle to Trust and Sweetwater recorded | 11-ap-01180 | | void transfer to Trust; void transfer to Sweetwater as invalid corporation |
| 2/10/2005 | Pyle files a chapter 13 bankruptcy petition | 05-bk-10761 | | characterizes the two properties as life estates with son as beneficiary |
| 3/25/2005 | Berry records abstract of judgment in 99C00380 | Proof of Claim | | |
| 4/28/05 | Pyle's chapter 13 bankruptcy case is dismissed | 05-bk-10761 | | |
| 7/3/2006 | Pyle conveys lot 12, next door to Sunland, to "Glen Pyle, as Trustee of the Pyle Irrevocable Trust dated January 12, 2000" | 10-bk-24968 | dkt. 211, ex. 32 | Berry claims that Pyle borrowed money from Maitland and on 7/11/06 he "reconveyed this property to the Trust" |
| 7/14/2006 | Pyle conveyed trust deed to Maitlands encumbering both Newhall and lot 12 | 10-bk-24968 | dkt. 211 | |
| 1/12/2007 | Mailtland group assigns trust deed to Leila Maitland | 10-bk-24968 | dkt. 211 | |
| 6/28/2010 | Berry renews judgment in 99C00380 | Proof of Claim | for $22,582 | |
| 11/30/2010 | Bankruptcy Case filed | 10-bk-24968 | | |
| 3/7/2011 | Berry Adversary Proceeding filed | 11-ap-01180 | | |
| 3/7/2011 | Campbell Adversary Proceeding filed for nondischargeable judgment and denial of discharge | 11-ap-01181 | | |
| 3/29/2011 | First amended complaint filed by Berry under state law | 11-ap-01180 | dkt. 4 | |
| 4/6/2011 | Berry starts discovery | 11-ap-01180 | | |
| 5/6/2011 | Pyle's attorney (Richard Singer) files answer to complaint asserting statute of limitations as an affirmative defense under state law | 11-ap-01180 | | |
| 5/11/2011 | Trustee motion to sell to Berry | 10-bk-24968 | dkt. 8 | per Berry this was on the Trustee's form |
| 6/17/2011 | Order granting Trustee's motion for authority to sell estate's interest in the avoidance action to Berry | 10-bk-24968 | dkt. 24 | |
| 10/3/2012 | Richard Singer withdraws as attorney for Pyle in the Berry Adversary Proceeding | 11-ap-01180 | | |
| 3/18/2013 | Ray Aver substitutes in for Pyle as attorney in the Berry Adversary Proceeding | 11-ap-01180 | | |
| 9/28/2016 | Memorandum and Order on partial decision on Pyle motion for summary judgment, deals with when discovery of transfer took place | 11-ap-01180 | dkt 140, 141 | |

| Date | Event | Source | Comments | Notes |
|---|---|---|---|---|
| 2/6/2017 | Berry notifies Aver in writing of his intention to file second amended complaint | 11-ap-01180 | Ex. 51 says "first amended complaint" | Aver will not complain about late timing |
| 5/24/2017 | Berry writes Leonard Pen, attorney for Trustee Amy Goldman, asking him to become co-counsel or new counsel due to health issues and need of Berry to close office | 10-bk-24968 | dkt. 211 | later Berry meets with Pena and suggests that they should prepare and file a new amended complaint |
| 9/18/2017 | Stipulation modifying 6/17/11 order selling estate's interest to Berry | 10-bk-24968 | dkt. 50, 53 | |
| 11/26/2018 | Berry files motion to file second amended complaint | 11-ap-01180 | | Pena writes that Trustee is the real party in interest - Ex. 54; per Berry, he had urged Pena to file a second amended complaint |
| 12/6/2019 | Campbell's attorney sends the title reports to the Trustee's attorney.  These had been ordered by prior counsel for the Trustee and were received on 3/13/19 | 10-bk-24968 | dkt. 66; dkt. 210 | |
| 5/4/2020 | Judgment denying discharge | 11-ap-01181 | dkt. 150, 151 | |
| 5/11/2020 | Title report filed with Court that shows that the 2/24/2000 deed on Vermont to the Pyle Trust is invalid since the deed does not identify the trustee of the Trust | 10-bk-24968 | dkt 66; title report dated 3/13/19 | |
| 5/11/2020 | Title report filed with Court that shows that the 6/28/04 deed on Sunland to the Pyle Trust is invalid since the deed does not identify the trustee of the Trust | 10-bk-24968 | dkt 66; title report dated 3/13/19 | |
| 5/26/2020 | Amy Goldman moves to substitute in as plaintiff for Berry | 11-ap-01180 | | |
| 6/25/2020 | Order for turnover of Vermont and Sunland | 10-bk-24968 | dkt. 78 | |
| 7/1/2020 | Motion to Strike Answer of Sweetwater and Enter Default Granted | 11-ap-01180 | dkt. 273 | |
| 9/30/2020 | Default judgment against Sweetwater under 11 USC 548(e) and Civ Code 3439.04 and 3439.09 | 11-ap-01180 | dkt. 287, 321 | Granted on the basis of lack of consideration |

## ARGUMENT AND ANALYSIS

In order to clarify the positions of the three principal players (the Trustee, Berry, and Campbell), the Court requested that each file its legal analysis of the following questions:

1. What is the maximum judgment that Berry could have attained if he had completed the adversary proceeding with a judgment against Pyle, the Trust, and Sweetwater Management?

   a. Would it make a difference if the fraudulent transfer action was only as to Sweetwater?

2. The adversary proceeding was brought solely under the Uniform Voidable Transactions Act and only for the judgment held by Berry. It never mentions the bankruptcy or the claims of the bankruptcy estate. Under these circumstances, can the Court give a judgment for more than is owed to Berry on his state court judgment?

   a. When the Trustee substituted in, she did not file an amended complaint to expand the first amended complaint to include her status as the bankruptcy trustee. If this went to judgment, what is the maximum amount of the judgment under these circumstances?

3. What is the effect of the sale by the Trustee of her avoiding powers to Berry?

   a. Would it have made a difference if she had not sold them to Berry? Could he still have proceeded with the fraudulent transfer action?

   b. Would it have made a difference in how much could be recovered in the current adversary proceeding?

   c. Would it have made a difference if Berry had not sold them back to the Trustee?

4. As a creditor pursuing his own claim, is Berry entitled to any amount beyond his judgment, accrued interest, and costs?

5. Since this was a sale of rights to Berry and Berry was his own attorney for his own claim, is he entitled to any attorney fees from the recovery and, if he is, is this limited to "reasonable attorney fees"?

    a. Even though there is an agreement and a court order dividing the proceeds of the adversary proceeding, can the Court now determine that it is giving Berry too little or too much money and this is not "reasonable"?

6. Because Berry also owned the rights of the Trustee, would he have been entitled to a judgment that is sufficient to cover all unsecured claims?

    a. In a chapter 7 case, can that judgment also include enough to cover all administrative claims?

All parties except the Debtor complied and this has been of great help in clarifying the issues.

This is a situation where everyone made serious procedural and practical mistakes. Mr. Pyle's attempt to transfer these properties to the Pyle Trust for the benefit of his son was ineffective and void and could have been properly handled had he sought legal counsel at the time. His addition of Sweetwater Management Company to the grant deeds and deeds of trust gave no benefit because he had never properly created Sweetwater Management as a California legal entity and because the identification on the grant deed was ineffective.

Further, Mr. Pyle's decision to fight Mr. Berry's collection attempts resulted in him having to pay Berry the sum of $46,122.77 to satisfy the state court judgment rather than the $11,369.45 which was the amount of the original judgment.[26] And the additional costs of the bankruptcy litigation added substantially to the draining of equity and loss of the Vermont property. This equity would have gone to Pyle, but now goes to administrative expenses and his other creditors.

---

[26] It is probable that Pyle had a valid defense to Berry's state court breach of contract complaint if Berry did not pursue arbitration (Bankruptcy Case dkt. 212, p. 54, 55). But the case docket indicates that Pyle did not appear in that 1999 case until 2010 when he filed a motion to vacate the judgment. If he did raise this issue at that time, it was rejected and no appeal was filed. LASC 99C0380 (now labeled as LASC 99CK0380).

Ms. Goldman, the bankruptcy trustee in this case, did not order and review a title report to determine the status and validity of the transfers from Pyle to the Pyle Trust. Had she done so, she would not have sold the action to Berry, retaining only 40% for the estate. At best she would have hired counsel and sought to set aside the transfers as void under California law. This would have avoided years of delays and resulted in much lower costs to the estate.

Mr. Berry committed malpractice in many ways. But because he was his own client, there is no liability to a third party, though he does suffer the consequences. First of all, he never ordered and reviewed a title report. Had he done so, he would not have needed to file his adversary complaint for fraudulent transfer since that was the incorrect cause of action. He would have and should have merely advised the Trustee of the void attempts to transfer and, perhaps, have sought to be employed to recover the properties.[27]  Instead, he concentrated on the issue of whether the transfers violated the Uniform Fraudulent Transfer Act, Civil Code 3439 et seq. (now the Uniform Voidable Transactions Act) and embarked on a voyage of complex and detailed discovery to meet the requirements of that statute. This was totally unnecessary.

Add to that, once he was made aware that he had no standing to pursue the adversary proceeding that he filed under Cal.Civ.Code 3439, et seq, Mr. Berry entered into an agreement with the Trustee to buy her rights under bankruptcy law. But he continued to concentrate on his standing to pursue payment of his own judgment and he did not amend his complaint to assert the rights of the Trustee to recover on behalf of the estate. He merely continued to litigate under California law, but now with the required consent of the Trustee and the approval of the bankruptcy court. There was nothing in the law requiring him to assert all of the Trustee's rights – merely that he had to have standing to pursue any of them. He chose to stay with the California provisions

---

[27] Mr. Pyle's assertion that the Trustee could not hire Mr. Berry due to a conflict is legally incorrect because Mr. Berry would be considered "special counsel", which was the role taken by Berry. 11 USC §327(c),(e). *In re Statewide Pools, Inc.*, 79 B.R. 312, 314 (Bankr. S.D. Ohio 1987).

rather than expanding the complaint to include those that uniquely exist under the bankruptcy code.[28]

And so this adversary proceeding lumbered on. Berry's explanation of why he did not file a second amended complaint is general and does not assert that he was aware that he should seek to move forward under bankruptcy law.  In his filing of March 2, 2021 – after blaming the Trustee for failing to suggest that he file a second amended complaint "adding Goldman as Plaintiff or increasing the damages prayer" – he notes that while the case advanced he became aware that it might be advisable to file an amended complaint, apparently because he now had more information of Pyle's wrongdoing per the Campbell complaint.  He began to keep a file with "notes and memos, papers and information that would be useful when preparing a Second Amended Complaint.  He labeled the file 'Amended Complaint.'"  Berry indicates that in February 2017, some six years after he bought the Trustee's rights, he decided that it might be a good idea to seek to amend the complaint.  And so he contacted Raymond Aver, Pyle's attorney, and asked if Aver would oppose an amendment on the grounds of delay.  Aver agreed to waive that specific opposition.  "Stripped of his <u>need to quickly file</u> the amendment, Berry prosecuted discovery diligently." [emphasis in the original]"[29]

It is clear from this explanation that Berry was not aware of the need for a simple amendment of law, but intended to amend to add facts and theories under his existing complaint to recover only on his own judgment.

In May 2017, a few months after his contact with Mr. Aver about the timing of a second amended complaint, Berry approached the Trustee's counsel asking that the Trustee provide co-counsel or take over the adversary proceeding due to Berry's ill health.  Negotiations occurred and in September 2017 the agreement to modify the sale order of June 17, 2011 was put before the court.  Over a year later, in November 2018, Berry filed a motion to file a second amended complaint, which was opposed by the

---

[28] Mr. Berry assets that he lacked knowledge of bankruptcy law.  This is no excuse. For example, it would be unethical if he had represented a family law client (his specialty) whose spouse was in bankruptcy without at least consulting with a knowledgeable bankruptcy attorney.  In representing himself, he did not take this precaution.
[29] Bankruptcy Case, dkt. 211, p. 10

Trustee on standing grounds and denied by the Court for the same reason.  The major difference between the proposed second amended complaint and the prior complaint is that the new complaint states that Pyle "is/was an insider at all times as referenced in 11 USC §548(a)(1), (B)(IV)" and it prays that the conveyances be declared void not only to the extent necessary to satisfy Berry's state court judgment, but also as to "other creditors of the individual defendant Glen E. Pyle."[30]  Nowhere in the proposed second amended complaint does Berry specifically state that he has any right to assert a cause of action under the bankruptcy code.

The real problem for Mr. Berry is that he pursued this under the wrong legal theory.  For there to be a fraudulent conveyance, there needed to be an effective conveyance.  The defendant had to have some legal rights in or to the property.  Section 548(a)(1) begins: "The trustee may avoid any transfer…of an interest of the debtor in property….  "Similarly, Cal. Civ. Code §§3439.04 and 3439.05 begin by saying a "transfer made or obligation incurred by a debtor is voidable as to a creditor…."  The term "transfer" is defined in Cal. Civ. Code §3439.01 to mean "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, license, and creation of a lien or other encumbrance."  Under bankruptcy law, the term "transfer" is defined as "(A) the creation of a lien; (B) the retention of title as a security interest; (C) the foreclosure of a debtor's equity of redemption; or (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, or disposing of or parting with – (i) property; or (ii) an interest in property."[31]

In this bankruptcy case, no transfer took place.  While Pyle attempted to transfer the two pieces of property to the Pyle Trust and to Sweetwater, both attempts were ineffective and thus there was no transfer to avoid.  The proper method to clean title and

---

[30] Berry Adversary Proceeding, dkt. 238, 10:14 and 13:11.
[31] 11 USC §101(54)

remove these attempted transfers would probably have been either a complaint to quiet title or perhaps a preference action because the recorded deeds were ineffective.[32]

Having noted the proper procedural process and the improper one that was used, the Court needs to determine how much, if anything, is owed to Mr. Berry under his agreement with the Trustee, which was approved by the Court.[33]

Mr. Berry claims that he is entitled to payment of his secured judgment claim (which has already occurred in the amount of $46,122.77), and per the amended contract with the Trustee, he is also entitled to $8,000 costs and 50% of the equity in the Vermont and the Sunland properties (totaling about $347,500).[34]  The Trustee asserts that Berry is entitled to no payment under the contract because there was no judgment in the adversary proceeding based on fraudulent transfer, but at most – under any scenario - he would be allowed $63,929.75.[35]  The Campbell Trust argues that Berry is entitled to nothing beyond the payment of his secured judgment claim.

### LEGAL ANALYSIS AND RULING

The Court reluctantly agrees with the position of the Trustee and of Campbell that Berry is not entitled to any money beyond the payment of his claim, which has already occurred.  The reluctance is because Mr. Berry put his heart and soul into prosecuting this case.  Although it was for his own monetary and emotional satisfaction, nonetheless he spent many hours seeking information from a difficult and uncooperative opponent. And although the Court has previously <u>tentatively</u> ruled in Mr. Berry's favor, those tentative rulings are just that … tentative.  The word "tentative" is a common English word and means something that is not yet definite or positive.  This Court (as do other courts) uses tentative rulings to indicate the direction that they are heading and to

---

[32] It should be noted that the Court also erred in granting the default judgment to the Trustee as to Sweetwater in the Berry Adversary Proceeding and the Trustee should review whether there is remedial action needed. Even if Sweetwater qualified as a viable LLC, Pyle's interest as the sole owner became property of the estate. 11 USC sec. 541; *Fursman v. Ulrichln (In Ire First Protection, Inc.)*, 440 B.R. 821, 830 (Bankr. 9th Cir. 2010)

[33] Bankruptcy Case, dkt. 50

[34] Bankruptcy Case, dkt. 211, p. 15

[35] Bankruptcy Case, dkt. 194, p. 17

engender discussion by the parties, clarification of facts, new legal analyses, and guidance to a better final ruling.  In this case the tentative rulings did exactly that and the later briefs and arguments led me to completely change my understanding of the facts and law of the Berry Adversary Proceeding.

It is clear from the prior tentative rulings and from the above paragraph that I want Mr. Berry to be well compensated for the hours that he spent.  But his mistakes – as described herein – have precluded that.  This Court is limited by the facts as described herein and the law that governs how those facts must be treated.

## The Properties Were Never Transferred

The situation before the Court is one where the Trustee hires a contingency attorney (even though she "sold" the estate's rights, she was essentially hiring a contingency attorney) to sue to set aside a fraudulent transfer and thus to bring the property back into the estate or to recover a judgment against the property and the transferee (the Pyle Trust).  The judgment would maximize out at the amount needed to pay all unsecured claims as well as the estate's administrative expenses.  To the extent that there was equity beyond that sum, the excess would be returned to Pyle.

Litigation went on for years as to whether the acts that resulted in the deeds to the Pyle Trust and to Sweetwater met the requirements of the fraudulent transfer statute.  But then it became clear that no transfer (fraudulent or otherwise) actually occurred because the recipients - the Pyle Trust (rather than the trustee of that trust) and probably Sweetwater (as discussed above and as a corporation that may have lacked good standing under California law) - were ineligible to receive the interests allegedly transferred. Under these circumstances, neither the properties nor any money could be "recovered" because they were already owned by the estate. The properties were always properties of Pyle and therefore automatically became part of his estate upon the filing of the Bankruptcy Case.  Because the attempted transfers created no legal change of ownership or interest, there was nothing to avoid in order to return the

properties to the estate.  They had always been there. And thus the contingency attorney is not entitled to anything.

However, because Pyle asserted that ownership resided in Sweetwater and the Pyle Trust, some action had to be taken so that clean title could be conveyed by the Trustee.  As noted, this could have been accomplished by a quiet title or preference action and resolved through a motion for judgment on the pleadings or for summary judgment.  Had Mr. Berry been hired for this and had he carried through, there would be some payment due to him under the terms of the agreement. But there was no such agreement and no such litigation.  And the Court cannot convert the fraudulent transfer adversary proceeding into one for quiet title or preference.

Pyle argues that no deed was needed to transfer the property from his ownership to himself as Trustee of the Pyle Trust.[36]  Beyond the fact that he is raising this issue months after the final ruling on ownership, he is incorrect because of the bankruptcy. Even if this is the law in California (and the Court has no need to investigate whether it is or whether it would apply to the transfers in question), bankruptcy law determines that the prepetition interest of a debtor is not transferred until that act is perfected against third parties.  Thus, the transfer between Pyle and the Pyle Trust may be unattackable by either Pyle or the Pyle Trust, but it does not become unassailable by the bankruptcy trustee or a third party until some further step is taken – in the case of real property that is the recording of the deed(s) of transfer.[37]  Because the deeds did not give notice of a legal transfer, the Trustee stands in the shoes of a bona fide purchaser for value (as does Mr. Berry) and the purported transfers can be set aside.

### Is Berry a Secured or an Unsecured Creditor?

Because this is a surplus estate, Berry's secured or unsecured status would not lead to a different distribution on his claim.  But the nature of his status has been mentioned and needs to be ruled on.

---

[36] Bankruptcy Case, dkt. 212

[37] 11 USC §544(a)(3), §547(e); 5 Collier on Bankruptcy ¶547.05; Cal. Civ. Code §1213.

This question has never been properly raised.  Although Pyle argued that Berry's judgment became unenforceable due to the passage of time, everyone else assumes that Mr. Berry is a secured creditor of Pyle's. As to Pyle's assertions, a California judgment is enforceable for a period of ten years after it is entered.  However, it can be renewed during that period, which extends it an addition ten years from the date that the application for renewal is filed.[38] The judgment was entered on August 7, 2000 and Berry renewed it on June 28, 2010, which was within the ten year enforcement period.[39]

The judgment was enforceable when the Pyle Bankruptcy Case was filed.  This gave Berry a valid claim in the Bankruptcy Case, but the record before this Court shows that Berry actually has an unsecured status rather than a secured one.  Reviewing the chronology above, although Berry obtained his judgment in August 2000, he did not create a judgment lien until he recorded his abstract of judgment on March 25, 2005.  However, at that point in time, Pyle was a debtor in his chapter 13 bankruptcy case, which was filed on February 10, 2005 and was not dismissed until April 6, 2005.[40] Thus, the recording of the abstract was a violation of the automatic stay.  Berry was named in the bankruptcy case as an unsecured creditor and would have received notice of the stay prior to recording his abstract. This means that the recording of that document had no legal effect.

Berry renewed the judgment on June 28, 2010, five months before the current bankruptcy was filed. As noted, this allows him to file a valid proof of claim to enforce his judgment, but I don't know if he recorded a new abstract or did anything else to perfect a judgment lien. I leave it to the Trustee to determine whether there is any action that must be taken.  But because this is a surplus estate, it appears that Berry would receive the same amount for the claim itself whether it is secured or unsecured.

The issue of whether Berry was a secured creditor or an unsecured one does come up in the discussion of whether he had standing to move forward with the

---

[38] Cal. Code Civ. Proc. §§683.020, 683.110, 683.120(b)
[39] Pyle's assertions are contained throughout Bankruptcy Case, dkt. 212 and were previously raised in other filings.
[40] 05-bk-10761

fraudulent transfer adversary proceeding.  The Trustee argues that Berry does not have

standing as Plaintiff in the Berry Adversary Case because he is a secured creditor and

California law limits the rights under the Uniform Voidable Transactions Act to

unsecured creditors, citing to *Renda v. Nevarez*, 223 Cal.App.4th 1231, 1235 (2014):

> The UFTA "declares rights and provides remedies for unsecured creditors
> against transfers that impede them in the collection of their claims," and its
> purpose "is primarily to protect unsecured creditors against transfers and
> obligations injurious to their rights." (Legis. Com. com., 12A West's Ann. Civ.
> Code (1997 ed.) foll. § 3439.01, pp. 272, 273; accord, *Mejia v. Reed* (2003) 31
> Cal.4th 657, 664 [3 Cal. Rptr. 3d 390, 74 P.3d 166] (Mejia).)

While this may be the history of the concept of avoiding transfers and may have been

mentioned in the Legislative Comments, the act itself is broader than that. Civ. Code

§3439.01(b) includes secured and unsecured rights of payment in its definition of claim:

> "Claim," except as used in "claim for relief," means a right to payment, whether or
> not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent,
> matured, unmatured, disputed, undisputed, legal, equitable, secured, or
> unsecured.

And a "creditor" is one who has a claim. Both Civ.Code §3439.04 and §3439.05 begin

with the words that a "transfer made or obligation incurred by a debtor is voidable as to

a creditor."  Thus, Berry is a proper plaintiff under California law whether he is a secured

or an unsecured creditor.

Similarly, the rights of the Trustee are to set aside a transfer for the benefit of the

estate, though she stands in the shoes of the unsecured creditors.  11 USC 544(b)

states:

> Except as provided in paragraph (2), the trustee may avoid any transfer of an
> interest of the debtor in property or any obligation incurred by the debtor that is
> voidable under applicable law by a creditor holding an unsecured claim that is

allowable under section 502 of this title [11 USCS § 502] or that is not allowable only under section 502(e) of this title [11 USCS § 502(e)].

There is no doubt that had Berry properly asserted the rights of the Trustee, which he bought, he would have had standing to move forward to set aside the transfers for the benefit of the estate, without limit to his judgment and whether his personal claim was secured or not.[41]  *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 809 (9th Cir. 1994). *Decker v. Voisenat (In re Serrato),* 214 B.R. 219, 231-2 (Bankr. ND CA 1997).

<u>Berry Did Not Exercise the Rights of the Estate</u>

Whether Berry owned the legal right to exercise the strong-arm powers of the bankruptcy trustee is not the issue.  One can and does own a plethora of legal rights.  For example, an adult who is an American citizen has the legal right to vote.  But if s/he does not exercise that right by registering and casting a ballot, there is no consequence from the existence of that right.

Mr. Berry filed the adversary proceeding for his own benefit – to recover the amount of the pre-petition state court judgment that he held.  Although his judgment against Pyle predated Pyle's recorded transfer of the properties (see chronology), he failed to immediately record his abstract of judgment and, when he did, it was a violation of the automatic stay.  At the time that he recorded the abstract, the deeds that attempted to transfer the properties had already been recorded.  So he was forced to act and he did this by filing the adversary proceeding.  But this was for his own benefit.

When he was advised by the Trustee that his adversary proceeding was without effect because the rights to a fraudulent transfer claim under both state and bankruptcy law were held exclusively by the Trustee, he bought those rights from the estate.  But he never sought to exercise the additional powers that he now owned.  He continued to seek only to recover the amount owed to him on his state court judgment.  The

---

[41] At least one unsecured creditor (Campbell) did exist at the time that the Pyle Bankruptcy Case was filed.

expanded rights of the estate lay dormant until it was too late because he had sold the adversary proceeding back to the Trustee.

Berry's failure to exercise rights that he had has caused him to lose them – even if he had actually prevailed on the fraudulent transfer complaint.  Hypothetically, had Berry prevailed on his state court claim to set aside the Vermont transfer under state law, he could have obtained a judgment for the $46,000+, which was the outstanding amount of his state court judgment with accrued interest.  The rest of the value of the property or the property itself would be returned to Pyle as the transferor.  Berry would then receive 50% of the $46,000+ Berry Adversary Proceeding judgment and the Trustee would keep about $23,000.  But this would not be sufficient even to pay Berry's unpaid state court judgment in the amount of about $46,000, let alone to pay the other creditors and costs of the estate.  At this point the Trustee would have to piggie-back on the Berry adversary judgment which determined that Vermont and Sunland are actually owned by Pyle.  The Trustee would liquidate Vermont (and maybe Sunland) to pay the balance needed to close the estate, probably as a surplus estate with interest.  Berry would be paid in full for his judgment and would receive the $23,000 as the equivalent of attorney fees for the work that he did, being a total of about $68,000.  But none of this would specifically be for his attorney fees.  It would just include a cut of the amount of the fraudulent transfer judgment.

## What Would Berry Have Been Entitled To If He Had Moved Forward Under 11 USC §548?

There is no dispute that if Berry had exercised the rights that he purchased from the Trustee, the amount recovered would have been the entire transfer of Vermont for the benefit of the estate under section 550 in an amount sufficient to pay all creditors and administrative expenses.  Assuming that the attempted transfers had a legal effect, under the repurchase agreement Berry might have been entitled to as much as

$110,000 beyond his secured claim of $46,000+ (or maybe less if his claim is deemed to be unsecured).[42]

If the Trustee's estimate of administrative fees is correct, the maximum recovery as to Vermont would not quite pay all creditors and expenses in full and because Sunland is a valuable asset of the estate, it would be necessary to somehow obtain enough money from that to pay the balance owed to unsecured creditors as well as interest on their claims.  Presumably Mr. Berry would also claim 50% of that extra amount (and it appears that he may be actually claiming 50% of the total value of Sunland). The specific results of dealing with Sunland are unknown.  The picture provided by the Trustee shows some 25 or more cars parked on the property.  Although many of them may have been on the adjacent lot, which is owned by the Pyle Trust, the mere fact that they are there will still lower the value of Sunland.

Sunland has not been inspected.  Dealing with Mr. Pyle during marketing will be difficult and expensive. A Zillow estimate is that this property (in good condition) would be worth more than $1 million dollars.  Assuming that this is a substantial overestimate of its current value due to its unknown condition, it still appears that the lot itself has significant value, even if the house is a "tear down."  So it is clear that unsecured creditors are entitled to interest on their claims.

### Is Berry Entitled to Attorney Fees For the Work That He Did?

The short answer is that he is not – either under California law or under bankruptcy law.  There are several reasons, but the most prominent one – other than the prohibition under California law – is that the sale order back to the Trustee removed the clause that allowing Berry to receive "reasonable attorney fees" from the 50% attributable to the Trustee:

---

[42] **Bankruptcy Case, dkt. 50, 53.** Per the Trustee's status report filed March 10, 2021, her estimates of assets and liabilities (without consideration of possible interest to unsecured creditors) lead to this conclusion.

<u>Sale Contract</u>: "The Buyer would pay to the Trustee, for the benefit of the estate's creditors, a [*sic*] 40% of the net proceeds of any recovery minus reasonable attorney fees and costs ("Purchase Amount") as consideration for the purchase."[43]

<u>Order on Sale Contract</u> " …for 40% of the net proceeds of any recovery after payment of attorney fees and costs, ("Purchase Amount")."[44]

<u>Resale Agreement/Modification of Sale Contract (which superseded the sales contract)</u>:  "The Trustee and Berry agree to distribute the  gross proceeds of any settlement, judgment or proceeds from  the Adversary Proceeding as follows:

a.      First, upon satisfactory proof to the Trustee, all of Berry's costs associated with  this Adversary Proceeding up to  $8,000.00;

b.      After payment of the costs in paragraph "a." fifty percent (50%) to Berry and fifty percent (50%) to the bankruptcy estate"[45]

Therefore any right to claim attorney fees from the money that went to the estate was yielded when Mr. Berry entered into the Resale/Modification Contract.

And, of course, any right claimed by Mr. Berry was contingent on a recovery of the propert(ies) through the Berry Adversary Proceeding, which did not happen.  And had a judgment been awarded, it would have been under California law and Berry would have been precluded from a judgment for attorney fees in that situation.[46]

---

[43] Bankruptcy Case, dkt. 18
[44] Bankruptcy Case, dkt. 24
[45] Bankruptcy Case, dkt. 50, 53
[46] It should be noted that Mr. Berry blames the Trustee for any deficiencies in the two sale agreements and orders thereon.  Beyond the fact that there were clear errors in the descriptions of the item being sold (as discussed above in fn 14 and 15) which indicates that Mr. Berry may not have even read the sales agreement and proposed order, the Trustee was not Berry's attorney and Mr. Berry, himself, is an attorney.  He knew what he was buying. His faults are his own and he cannot transfer the responsibility to the Trustee.

Nonetheless, it is worth exploring any other method that could be used to compensate Mr. Berry for the time that he and his assistant expended on the case.

Berry points the Court to holdings under 11 USC 330(a), which allows for the payment of necessary and reasonable attorney fees:

> (a)(1) After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329 [11 USCS §§ 326, 328, and 329], the court may award to a trustee, a consumer privacy ombudsman appointed under section 332 [11 USCS § 332], an examiner, an ombudsman appointed under section 333 [11 USCS § 333], or a professional person employed under section 327 or 1103 [11 USCS § 327 or 1103]—
>
> (A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, ombudsman, professional person, or attorney and by any paraprofessional person employed by any such person; and
>
> (B) reimbursement for actual, necessary expenses.

Berry was never employed by the Court as the attorney for the Trustee.  This precludes him from receiving an award of fees from the bankruptcy estate.  An attorney who is hired by the Trustee to represent the estate is required to seek a court order approving that employment. The Bankruptcy Appellate Panel succinctly lays this out in the context of representation of a creditors' committee. *In re Monument Auto Detail, Inc.,* 226 B.R. 219, 224 (9th Cir. BAP 1998):

> As the BAP has previously stated on more than one occasion,
>
> [c]ourt approval of the employment of counsel for a debtor in possession is the sine qua non to counsel getting paid. Failure to obtain court approval of a professional in accordance with § 327 and Rule 2014 precludes the payment of fees.  *Weibel*, 176 B.R. at 211 (quoting *Shirley*, 134 B.R. at 943–44) (emphasis added).  The BAP has also clearly held that the Code and Rules preclude fee

awards for services performed on behalf of a bankruptcy estate based on state law theories not provided for by the Code, such as quantum meruit. *Weibel*, 176 B.R. at 212; *Shirley*, 134 B.R. at 944.

It is possible, but not probable, that the Order approving the sale of the Berry Adversary Proceeding might be interpreted as a Court Order granting employment since it does call for Berry to receive attorney fees from the estate's portion of the ultimate judgment.  There is also some flexibility so that the bankruptcy court can allow employment *nunc pre tunc* under certain circumstances. *Atkins v. Wain, Samuel & Co. (In re Atkins),* 69 F.3d 970, 973 (9th Cir. 1995).[47]

Should the Court decide that Mr. Berry qualifies to receive attorney fees – either under the original Sale Order or *nunc pro tunc* – looking at either the original sale agreement or at the resale agreement, the issue would be what is a reasonable amount.

Starting with the concept that these were contingency fee agreements, would the amount of 50% or 60% be reasonable?  The Court finds that it would not be reasonable compensation.

Specifically reviewing the criteria for "reasonable compensation" as set forth in 11 USC §330((3) and (4):

> (3) In determining the amount of reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including--
>
> (A) the time spent on such services;
>
> (B) the rates charged for such services;
>
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

---

[47] This issue was never raised or argued by the parties, so it is only probable as to the final outcome of a motion for *nunc pro tunc* employment.

(D) whether the services were performed within a reasonable amount of time

commensurate with the complexity, importance, and nature of the problem,

issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or

otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary

compensation charged by comparably skilled practitioners in cases other than

cases under this title.

(4)(A) Except as provided in subparagraph (B), the court shall not allow

compensation for--

(i) unnecessary duplication of services; or

(ii) services that were not--

(I) reasonably likely to benefit the debtor's estate; or

(II) necessary to the administration of the case.


    The  professional needs to demonstrate that the services were reasonably likely

to benefit the estate at the time rendered. *In re Garcia*, 335 B.R. 717, 724 (9th Cir. BAP

2005).  As noted above, because of Mr. Berry's misunderstanding of the law and use of

an incorrect legal theory, the services were not reasonably likely to benefit the estate at

any point in the proceedings. But even if they were, this is not a blank check for an

attorney to act unreasonably in the time and effort spent when considering the likely

recovery.

    *Fann Contracting, Inc. v. Garman Turner Gordon LLP,* 620 B.R. 141 (D.C. Nev.

2020) sets forth the factors to be considered when reviewing a fee request for

reasonableness.  These are (1) a consideration of the results achieved, (2) a review of

the value of property apparently already owned by the bankruptcy estate, and (3) the

reasonableness of the requested fees and expenses given the facts of this particular

case.

As to consideration #1, in the current case, the results are negligible or even negative.  Because Berry pursued the fraudulent transfer action, which is fact specific and rather complex, rather than a quiet title or preference one, the sale of Vermont was delayed by years while unsecured creditors have waited for a distribution.

Consideration #2 does not apply to this case.

In looking at consideration #3, 11 USC §330 allows the court to grant compensation less than the amount requested.  It sets forth a series of criteria to be considered in arriving at the correct amount. Although the "lodestar" method is often used as a guide to determine a presumptively reasonable amount of attorney's fee, that is not a mandatory approach.

> The customary method for assessing an attorney's fee application in bankruptcy is the "lodestar," under which "the number of hours reasonably expended" is multiplied by "a reasonable hourly rate" for the person providing the services. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Unsecured Creditors' Comm. v. Puget Sound Plywood, Inc*., 924 F.2d 955, 960 (9th Cir.1991). However, the lodestar method is not mandatory. See *Unsecured Creditors' Comm*., 924 F.2d at 960 ("Although *[In re Manoa Finance Co*., 853 F.2d 687 (9th Cir.1988),] suggests that starting with the 'lodestar' is customary, it does not mandate such an approach in all cases."); *In re Busy Beaver Bldg. Ctrs., Inc*., 19 F.3d 833, 856 (3d Cir.1994) ("While bankruptcy fees are commonly calculated using the lodestar method, ... § 330 by no means ossifies the lodestar approach as the point of departure in fee determinations.").

*In re Eliapo*, 468 F. 3d 592, 598 (9th Cir. 2006)

Mr. Berrys set forth the number of hours, etc. that he has worked on the Berry Adversary Proceeding.[48]  He spent 537.2 attorney hours at $425 per hour, totaling $228,305 and his paralegal spent an additional 333.9 hours at $165 per hour, totaling $55,345.  Included in this were three depositions (24.7 attorney hours), court hearings

---

[48] Bankruptcy Case, dkt. 196, p. 17, ex. 6 , 7, and 8

(47.8 hours), and legal research, mediation and settlement proposals (47.8 hours). Thus the total fees for himself and his paralegal are $283,000 in billable hours.

It would be a drastic understatement to say that it is ludicrous to spend $283,000 in an attempt to collect a judgment which, including post-judgment interest for some ten years, totals about $46,000.  Thus the lodestar method does not help Berry.

Having reviewed the various possibilities, the Court comes to the conclusion that Mr. Berry is not entitled to any award beyond the payment of his judgment.  The fraudulent transfer adversary proceeding did not result in a successful outcome and was totally unnecessary.  However, other issues were raised and thus I am indicating the various alternative amounts if a reviewing court finds that there was a sufficient benefit to award anything to Mr. Berry.

(1) The fraudulent transfer Adversary Proceeding did not result in a successful outcome and was totally unnecessary.  Under the terms of the sale agreement, nothing was to be paid unless the Berry Adversary Proceeding resulted in an award for the Plaintiff.  It did not and thus there are no grounds to pay Mr. Berry for the work that he did on that case.  Further, the resale agreement supersedes the sale contract and it excludes the prior provision for attorney fees. Beyond that, even if a judgment had been obtained against the Pyle Trust, this was on an incorrect legal basis and would be subject to reversal on appeal.

The issue of the agreement to pay Mr. Berry up to $8,000 in costs from the proceeds of the Berry Adversary Proceeding is more complex.  There were no proceeds because the sale of Vermont was done through a turnover order in the Bankruptcy Case.  However, a default judgment was entered against Sweetwater in the Berry Adversary Proceeding, although it may be subject to being set aside if no legal transfer was made. As a matter of equity and because this is a small sum of money, if the judgment as to Sweetwater is not vacated, I  will allow the

Trustee to pay Mr. Berry the stipulated amount of up to $8,000 on presentation of proof of those expenditures for costs.

Alternatively, given the theories put forth:

(2) The Berry Adversary Proceeding was limited to an award under state law and the maximum would be about $46,000.  If the prosecution of that adversary proceeding gave any benefit to the estate, it was the default judgment against Sweetwater.  Although the Court does not see this as a benefit because a judgment should have been obtained through an action for quiet title or preference and the current judgment may actually be voidable as discussed above, the most that Mr. Berry would receive is about $23,000 and the payment of his $46,000 claim.

(3) Had Mr. Berry timely amended the Berry Adversary Proceeding to assert the rights of the estate, the maximum judgment would be approximately $270,000, which is the amount of the unsecured claims, and the administrative claims, although Trustee's attorney fees probably would have been much lower than estimated.  The Court views this as a contingent fee arrangement.  Since Mr. Berry was never employed by the Court, he would be entitled to no fees.  If this is seen as a contract or it is deemed that the Court tacitly approved his employment when it entered the order on the sale back to the estate, the fee must be reasonable.  While $135,000 is 50%, looking at the benefit to the estate at the time that the work was performed, it appears that the amount of $30,000 (as suggested by the Trustee) is a more realistic award.

Because the Berry Adversary Proceeding was brought under an incorrect legal theory and title to the Property could have been ordered into Mr. Pyle's name, making this an asset of the estate, there was no need for this adversary proceeding and neither Mr. Berry nor the Trustee can be determined to be the prevailing party.  Therefore no

1  fees will be awarded to Mr. Berry.

3    The following is a draft distribution chart in conformance with this Memorandum

of Opinion and using the figures provided by the Trustee.[49] Some amounts are

estimates, as noted, and the final distributions will be approved by specific court orders

(such as for fees) and through the Trustee's final report.

| Description | Receipt | Disbursement | Balance in Estate | Comments |
|---|---|---|---|---|
| **GROSS RECEIVED FROM SALE OF VERMONT - BANKRUPTCY CASE DKT. 203** | | | | |
| Vermont Closing | $ 502,060.76 | | $ 502,060.76 | includes Linda Daniel's interest; net of costs of sale, commissions, property tax |
| Set aside for interest of Linda Daniel | | $ 251,030.38 | $ 251,030.38 | |
| Aleya Merida and Ranulfo Ceron | | $ 5,000.00 | $ 246,030.38 | |
| Leila Maitland | | $ 28,800.00 | $ 217,230.38 | |
| Marc Berry secured claim | | $ 46,122.77 | $ 171,107.61 | |
| | | | | |
| **TRUSTEE'S COSTS OF SALE** | | | | |
| Insurance policy (net) | | $ 1,399.66 | $ 169,707.95 | |
| Bond | | $ 286.14 | $ 169,421.81 | |
| Bank Fees | | $ 25.33 | $ 169,396.48 | |
| Balance remaining for unsecured creditors | | | $ 169,396.48 | |
| | | | | |
| **DANIEL CARVE-OUT - BANKRUPTCY CASE DKT. 170** | | | | |
| Set aside for interest of Linda Daniel | | | $ 251,030.38 | |
| To Linda Daniel | | $ 47,074.93 | $ 203,955.45 | |
| | | | | |
| Balance for Administrative Expenses | | | $ 203,955.45 | |

---

[49] Bankruptcy Case, dkt. 203

| Description | Receipt | Disbursement | Balance in Estate | Comments |
|---|---|---|---|---|
| Trustee's Fees (estimate) | | $  32,000.00 | $     171,955.45 | |
| Legal Fees (estimate) | | $ 130,000.00 | $      41,955.45 | |
| Accounting Fees (estimate) | | $  25,000.00 | $      16,955.45 | |
| Balance from Linda Daniel carve out remaining creditors' claims | | | $      16,955.45 | |
| **AMOUNT AVAILABLE TO PAY UNSECURED CREDITORS** | | | | |
| From Estate's 50% interest | | | $     169,396.48 | |
| From Linda Daniel carve-out | | | $      16,955.45 | |
| **Total Available to pay unsecured claims** | | | **$     186,351.93** | Trustee shows receipt of a sanction payment of $4,896.45.  This is not in the calculation - was it for Marc Berry? |
| Costs to Berry per Sale Resale Agreement | | $8,000.00 | $178.351.93 | |
| unsecured claims | | $  86,549.59 | $      99,802.34 | |
| interest on unsecured claims | | unknown | unknown | |
| balance goes to Glen Pyle | | unknown | unknown | |

###     Date: April 6, 2021

_(signature)_
_____
Geraldine Mund
United States Bankruptcy Judge